UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA ANN HAGEN,

              Plaintiff,              CIVIL ACTION NO. 11-12109

            v.                          DISTRICT JUDGE JOHN CORBETT O'MEARA

COMMISSIONER OF             MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

              Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

I.    **PROCEDURAL HISTORY**

    *A.    Proceedings in this Court*

    On May 12, 2011, Plaintiff filed suit seeking judicial review of the Commissioner's

decision disallowing benefits (Dkt. No. 1).  Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule

72.1(b)(3), this matter was referred to the undersigned for the purpose of reviewing the

Commissioner's decision denying Plaintiff's claim for a period of Disability Insurance and

Supplemental Security Income benefits (Dkt. No. 3).  This matter is currently before the Court on

cross-motions for summary judgment (Dkt. Nos. 10, 13).

    *B.    Administrative Proceedings*

    Plaintiff filed the instant claims on March 21, 2007, alleging that she became unable to

work on January 1, 1990 (Tr. 11, 112-113).  The claim was initially disapproved by the

Commissioner on June 21, 2007 (Tr. 11, 67-70).  Plaintiff requested a hearing and on September

29, 2009, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) Richard L.

Sasena, who considered the case *de novo*. In a decision dated January 4, 2010, the ALJ found

that Plaintiff was not disabled (Tr. 8-25). Plaintiff requested a review of this decision on March

4, 2010 (Tr. 5-7). The ALJ's decision became the final decision of the Commissioner on March

15, 2011 when the Appeals Council denied Plaintiff's request for further review (Tr. 1-4).

In light of the entire record in this case, this Magistrate Judge finds that substantial

evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly,

it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**,

Defendant's motion for summary judgment be **GRANTED**, and that the findings of the

Commissioner be **AFFIRMED**.

## II.     STATEMENT OF FACTS

### A.     *ALJ Findings*

Plaintiff was 21 years old at the time of the most recent administrative hearing (Tr. 13).

Plaintiff has no past relevant work history (Tr. 20). The ALJ applied the five-step disability

analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial

gainful activity since March 21, 2007 (Tr. 13). At step two, the ALJ found that Plaintiff had the

following "severe" impairments: attention deficit hyperactivity disorder, obsessive compulsive

disorder and borderline intellectual functioning. *Id*. At step three, the ALJ found no evidence

that Plaintiff's combination of impairments met or equaled one of the listings in the regulations.

(Tr. 13-15) Between steps three and four, the ALJ found that Plaintiff had the Residual

Functional Capacity (RFC) to perform "a full range of work at all exertional levels but with the

following nonexertional limitations: the claimant is limited to simple, routine and repetitive tasks

that require little judgment; low stress, no production rate; and can be learned in a short period of

time; no interaction with the public; occasional interaction with coworkers; and needs close

supervision every hour to check to see if she is on task" (Tr. 15). At step four, the ALJ found

that Plaintiff has no past relevant work. (Tr. 20) At step five, the ALJ denied Plaintiff benefits,

because the ALJ found that Plaintiff could perform a significant number of jobs available in the

national economy, such as hand packer (5,000 jobs in southeastern Michigan), sorter (4,000 jobs

in southeastern Michigan), inspector (3,000 jobs in southeastern Michigan), bench assembler

(3,000 jobs in southeastern Michigan) and plastic sorter (1,500 jobs in southeastern Michigan)

(Tr. 21).

### B.   *Administrative Record*

#### 1. Plaintiff's Testimony and Statements

At the administrative hearing, Plaintiff testified that she graduated from Trenton high

school and took one year of "Child Development" classes at Wayne County Community College

(Tr. 31-33). Plaintiff stated that she dropped out of college after one-year, because the classes

"were hard," although Plaintiff was able to get "C's and up" for her college grades (Tr. 33).

Plaintiff stated that she was taking Adderall XR and Effexor XR to treat her ADHD and OCD

(Tr. 34). Plaintiff denied that these drugs caused her any adverse side-effects (Tr. 34-35).

Plaintiff testified that, in a typical day, she helped her 10-year-old sister get ready for

school, did laundry, cleaned the bathrooms and kitchen, vacuumed, cooked, shopped, mowed the

lawn, walked her dog, rode her bike, read novels; Plaintiff stated that she got along "great" with

family, neighbors, and friends (Tr. 36-38). She spent time with her friends at the movies, the

mall, and each other's houses (Tr. 37). Plaintiff testified that she was actively trying to find a job

and had recently applied for positions at Target, Meijer, Farmer Jack, the YMCA and Kohl's (Tr.

39). Plaintiff does not have a driver's license, because she failed the certification test (Tr. 34,

42).

Plaintiff's mother also testified at the hearing, and stated that Plaintiff participated in Girl Scouts until she was in the 12th grade, had a boyfriend for about two years, and used the computer for email and to manage her music (Tr. 59-60). Plaintiff's mother testified that Plaintiff has difficulties with "personal boundaries" and sometimes touches others inappropriately (Tr. 48); she also experiences difficulties managing and counting money (Tr. 52, 56) and is not able to use public transportation (Tr. 51).

In a written Third Party Function Report, Plaintiff's mother reported that Plaintiff cared for her personal hygiene independently, prepared simple meals, performed household chores, raked leaves, walked and fed the family dog, and rode her bike around the neighborhood and to school (Tr. 131-34). The report stated that Plaintiff had participated in Girls Scouts since the first grade; swam at either the YMCA or a community pool throughout the year; socialized with family several times a week; and spent time with one friend every 2 to 3 weeks (Tr. 135-36).

## 2. Medical Evidence

Plaintiff's brief did not attempt to summarize the record below; the Commissioner accurately summarized the record as follows[1]:

Plaintiff was certified as Educable Mentally Impaired when she was in the first grade (Tr. 173-76), and school records confirm that Plaintiff's overall intellectual functioning remained in the Educable Mentally Impaired range necessitating some special education services (Tr. 184-88, 198-218, 226-30, 238-58). In September 2005, Plaintiff attained a verbal IQ score of 75, a performance IQ score of 73, and full scale IQ score of 72 (Tr. 260). According to a November 2006 Individualized Education Program (IEP) report, Plaintiff spent 25 hours per week in a general education program and 5.08 hours per week in a special education program; she

---

[1] Some modifications to the Commissioner's summary have been made.

participated successfully in a childcare program; and she needed a modified curriculum to pass her general education classes (Tr. 238-48).

P.K. Dave, M.D., treated Plaintiff from her birth through March 2009 (Tr. 314-87). Progress notes reveal that Plaintiff attended routine well-child visits (Tr. 314-37), and Dr. Dave prescribed Plaintiff Concerta for ADHD beginning in 2000 through March 2009 (Tr. 384-87). On August 2, 2007, Dr. Dave completed a form on Plaintiff's behalf to support her application for vocational rehabilitation services with the Michigan Department of Career Development (Tr. 299). Dr. Dave identified Plaintiff's diagnoses as educable mentally impaired, ADHD, anxiety disorder, and exotropia[2] (Tr. 299). He reported that she had no functional limitations and needed no accommodations; she was trainable and could function in society; and she could work full-time if supervised (Tr. 299).

Upon Dr. Dave's referral, in September 2003, when Plaintiff was 15 years old, she underwent evaluation at the Children's Hospital of Michigan to determine whether she had ADHD and OCD (Tr. 264-68). Plaintiff's mother expressed concerns about Plaintiff's academic and social abilities and reported that although Plaintiff was in special education classes for math, reading, and science, she had not undergone an IEP since she was in the second grade (Tr. 264). Plaintiff scored a verbal IQ of 52, a performance IQ of 66, and a full scale IQ of 55, and the evaluators noted that she was functioning in the intellectually deficient range (Tr. 266). Because Plaintiff's attentional difficulties could not be fully explained by her cognitive deficits, the evaluators diagnosed ADHD (Tr. 266). They recommended that Plaintiff return to Dr. Dave for medication management of ADHD; undergo another IEP and obtain ongoing academic support;

---

[2] Extropia is a permanent deviation of the visual axis of one eye from that of the other, resulting in diplopea (double vision). *See* Dorland's Illustrated Medical Disctionary (31st Ed.) 669.

and consider vocational and social skills training (Tr. 267). They noted that Plaintiff did not appear to exhibit classic OCD, but referred her to a specialist to rule out the diagnosis (Tr. 267).

The following month, Plaintiff underwent further evaluation for OCD (Tr. 269-74). Plaintiff's mother reported that Plaintiff was performing well academically in school given her cognitive ability (Tr. 270). She also stated that Plaintiff was involved in Girl Scouts (Tr. 270). On examination, Plaintiff appeared well-groomed with a constricted affect and guarded but cooperative behavior (Tr. 271). She exhibited an anxious mood, calm motor activity, an intact memory, normal thought content, below average intelligence, impaired abstraction/reasoning ability, impaired insight, intact judgment, and expressive-impaired language ability (Tr. 271). Plaintiff denied suicidal or homicidal ideations (Tr. 272). The evaluators assessed ADHD; generalized anxiety disorder; provisional OCD; and educable mentally impaired by history, and assigned a current Global Assessment of Functioning (GAF) score of 55 and a highest GAF score within the past year of 60 (Tr. 272). They provided referrals for outpatient mental health treatment (Tr. 272-73), but no evidence suggests Plaintiff followed this treatment recommendation.

Between March 2009 and August 2009, Plaintiff treated with Mark Sawka, M.D., because she was too old to continue care with her pediatrician (Tr. 55, 308-13). Over this period, Dr. Sawka prescribed birth control pills, Adderral for ADHD, and Paxil for OCD (Tr. 308-13). In August 2009, Plaintiff reported improvement in her ADHD symptoms with medication (Tr. 313).

At the request of the state disability determination agency, Plaintiff underwent a consultative psychological examination with Hugh Bray, Ph.D., a licensed psychologist, in June 2007, when she was 17 years old (Tr. 275-79). Plaintiff reported that her mental health treatment consisted of taking Concerta once a day for ADHD (Tr. 276). She expressed interest in

attending college to study child care after graduating from high school (Tr. 276). Plaintiff

identified swimming, drawing, and reading as her current interests and getting married and

attending college as her future plans (Tr. 277-78). With respect to her daily activities, Plaintiff

reported that she did not shop for herself, manage money or use public transportation; she cared

for her hygiene independently, knew how to clean the house, cooked simple meals, interacted

with others, attended and participated in church, shoveled snow, attended school, did her

homework, took out the trash, played with her sister and friends, and cared for her dog (Tr. 277).

On examination, Plaintiff had a neat appearance, appropriate hygiene, and a slight slur to her

speech; she was friendly and laughed easily during the testing session (Tr. 277). She displayed

appropriate autonomy for her age, appropriate motivation, intact insight, intact judgment, intact

contact with reality, appropriate selfesteem, and normal motor activity (Tr. 277). Her stream of

mental activity was somewhat vague and circumstantial and she admitted to some ritual-type

obsessions, which her mother described as being "not as bad now but they are still an issue."

Plaintiff denied hallucinations, delusions, persecutions, suicidal ideations, somatic complaints,

sleep problems, weight changes, and thought disturbances (Tr. 277). Dr. Bray reported that

Plaintiff appeared alert and oriented times three, and she could repeat 5 digits forward and 4

digits backwards and 3 out of 3 objects after a 3-minute time delay (Tr. 278). He observed that

additional information provided by Plaintiff's mother showed that Plaintiff's IQ scores were

continually improving, although she had difficulty shifting her attention from one task to another

quickly and easily and had a tendency to narrow her attention and miss environmental clues (Tr.

278). Dr. Bray diagnosed ADHD, controlled by medication, a history of OCD and borderline

intellectual skills.  He assigned a GAF[3] score of 60, and opined that Plaintiff could manage funds in her best interest (Tr. 278-79).

On August 13, 2007, when Plaintiff was 19 years old, she was evaluated by James LaCombe, Ph.D, and Kathleen LaCombe, Sp.A., certified school psychologists, to determine her eligibility for disability-based financial assistance (Tr. 300-02). Plaintiff and her mother reported that she had a good health history with no major illnesses; graduated from high school where she attended special education classes; and was currently working with a representative from Michigan Rehabilitation Services to secure further training or work (Tr. 300). Plaintiff reported that she enjoyed school and wanted to work with animals or children (Tr. 300). On examination, Plaintiff presented as shy and serious with some difficulty using standard greetings (Tr. 300). She did not hesitate to answer questions, and her speech was simple, concrete, and clear (Tr. 300).  Plaintiff put forth her best effort to testing and paid excellent attention to tasks (Tr. 300).  Intelligence tests revealed that Plaintiff had a full scale IQ of 70, a verbal IQ score of 73, and a performance IQ score of 72; she demonstrated an eighth grade reading ability, a fifth grade spelling ability, and a third grade arithmetic ability (Tr. 301). The examiners noted that Plaintiff's intellectual ability fell within the mild range of cognitive impairment (Tr. 302). They reported that Plaintiff had difficulty with abstract reasoning and

_____

[3]  The GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 502 fn. 7 (6th Cir. 2006).

problem-solving in both verbal and non-verbal areas, although she exhibited strength in the area of rote memorization on a concrete level (Tr. 302). They opined that Plaintiff would be good at tasks requiring repetitive behavior and having predictable outcomes in a sheltered setting (Tr. 302). The examiners further reported that Plaintiff was independent with basic personal self-care, but needed help with banking, transportation, crossing streets, making simple purchases, and arranging social activities (Tr. 302). In their opinion, Plaintiff would always require supervision in a living situation and she would have limited employment opportunities as a result of her cognitive deficits (Tr. 302). The examiners suggested that Plaintiff's mother contact Michigan Rehabilitation Services for additional future planning resources and recommended that Plaintiff expand her social experiences outside of her home (Tr. 302).

On August 29, 2007, Ronald Kolito, Ph.D., evaluated Plaintiff upon the referral of Michigan Rehabilitation Services (Tr. 303-07). Plaintiff expressed interest in working at a childcare center or pet store and stated she was currently enrolled in community college classes (Tr. 303). On examination, Plaintiff spoke easily and fluently using a limited vocabulary (Tr. 303). She reported a history of mental health treatment within the special education system and complained of general memory problems (Tr. 304). Plaintiff described her childhood and teenage years as "happy" and reported currently having many friends (Tr. 304). She stated that in high school, she had the use of resource rooms and tutors, she had no problems in reading, and she was in special education for English, math, and science (Tr. 304). Plaintiff reported that she earned a letter in high school track; knew how to use a computer, various computer programs, and a calculator; and frequently used the internet and email (Tr. 304). She described her hobbies as walking the dog, running, and reading long novels (Tr. 304). Intelligence tests revealed a verbal IQ score of 74, a performance IQ score of 83, and a full scale IQ score of 76 (Tr. 305-06).

She obtained a high school reading level, a 6th grade arithmetic level, and a high school spelling level (Tr. 305). Other tests revealed that Plaintiff had good contact with reality; she would have difficulty with clerical occupations; and she exhibited no evidence of psychosis or neural cortical dysfunction in the area of spatial relations (Tr. 305). Dr. Kolito opined that Plaintiff would have difficulty earning a standard associates degree, but she would likely succeed in a non-competitive, non-technical community college program (Tr. 306). He observed that she graduated from high school without incident despite facing many difficulties; she appeared trustworthy and willing to follow directions; and she was a good candidate for a childcare program (Tr. 306). Dr. Kolito diagnosed ADHD (Tr. 306).

In June 2007, Thomas Tsai, M.D., a state agency mental health expert, reviewed the evidence to assess the severity of Plaintiff's mental impairments (Tr. 280-98). In his opinion, Plaintiff's impairments mildly limited her ability to perform daily activities; moderately limited her ability to maintain social functioning; moderately limited her ability to maintain concentration, persistence, or pace; and caused no episodes of decompensation, each of extended duration (Tr. 291). In an assessment of her mental functioning, Dr. Tsai reported that Plaintiff had moderate limitations in her abilities to maintain attention and concentration, accept criticism and respond appropriately to criticism, respond appropriately to changes in work settings, and perform activities with persistence and pace (Tr. 297). Dr. Tsai found that, nevertheless, Plaintiff could perform unskilled work (Tr. 280, 297).

In May 2008, Plaintiff performed light industrial work and machine operation at Goodwill Industries as part of a 4-week vocational evaluation to determine her employability skill levels (Tr. 149-54). Supervisor/evaluator, Joanna Dunlap, B.A., observed that Plaintiff had good attendance and punctuality; she was polite and worked well with others; and she

demonstrated accurate comprehension for demonstrated instructions (Tr. 151-52). However, Ms. Dunlap also reported that Plaintiff did not work independently and unsupervised; she had inappropriate conversations during work time; she had difficulty staying focused and on task; she required verbal prompting and redirecting; she had difficulty making simple-work related decisions and following simple verbal instructions; she could not explain her thoughts and ideas clearly; she exhibited low tolerance toward the Skill Building consumers; she lacked physical stamina and endurance; and she had no independent means of transportation (Tr. 151). Ms. Dunlap noted that Plaintiff had a 34% productivity rate for assembling an 8-piece license plate, a 10% productivity rate while operating a machine to assemble a 2-piece license plate, a 47% productivity rate for operating a table-top sealer, a 23% productivity rate for assembling a 4-piece license plate kit, and a 36% productivity rate for assembling a 2-piece license plate kit (Tr. 151-52). She recommended additional training and support for Plaintiff to gain appropriate work skills and habits, encouraged Plaintiff to reapply for SSI, and also noted that Plaintiff should participate in a work adjustment program (Tr. 153). Plaintiff told Ms. Dunlap that she intended to attend community college classes in the fall and would not be available until school began because she was currently babysitting her younger sister (Tr. 153).

On September 19, 2011, Dr. Dave wrote a "To Whom It May Concern" letter stating that Plaintiff could not "function individually and productively in a job-related environment" and she would "need constant supervision and all the help she [could] get to function in this society" ()Dkt. 10; Ex. 1). Dr. Sawka wrote an undated "To Whom it May Concern" letter stating that Plaintiff was functioning overall with an IQ of 66; she was disabled from gainful employment; and she could not be a reliable employee even with the use of medications (Dkt. 10; Ex. 2).

### 3. Vocational Expert

During the hearing, the ALJ asked a vocational expert (VE) to assume a hypothetical individual of Plaintiff's age and educational history who was limited to simple, routine, repetitive tasks that could be learned in a short period of time and required little judgment, no interaction with the public, and only occasional interaction with co-workers (Tr. 61-62). The VE testified that a person with those limitations could perform unskilled, light work as a sorter (4,000 regional jobs) and inspector (3,000 regional jobs), and unskilled, sedentary work as a bench assembler (3,000 regional jobs) and plastic sorter (1,500 regional jobs) (Tr. 62). Upon further questioning by the ALJ, the VE explained that the identified jobs were considered low-stress and quota-based positions (meaning the worker "ha[d] to have X amount done by the end of the day") (Tr. 62). The VE further stated that the identified jobs could be performed if the individual needed someone to come by every hour to check whether she was on-task and doing things properly since close supervision by supervisors was indicative of unskilled work (Tr. 63).

### C. Plaintiff's Claims of Error

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record. Plaintiff also argues that this matter should be remanded for consideration of two letters from Plaintiff's treating physicians that were submitted to this Court, but which were not provided to the ALJ (Dkt. 10; Pl.'s Br. at 2-6).

## III. DISCUSSION

### A. Standard of Review

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*,

493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony,

and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of*

*Soc. Sec.*, 167 Fed. App'x. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

without directly addressing in his written decision every piece of evidence submitted by a party.")

(internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx.

521, 526 (6th Cir. 2006).

### B.    *Governing Law*

The "[c]laimant bears the burden of proving her entitlement to benefits." *Boyes v. Sec'y*

*of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc.*

*Sec.*, 74 Fed. App'x. 515, 524 (6th Cir. 2003).   There are several benefits programs under the

Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et*

*seq.*) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et*

*seq.*).   Title II benefits are available to qualifying wage earners who become disabled prior to the

expiration of their insured status; Title XVI benefits are available to poverty stricken adults and

children who become disabled.   F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984).

While the two programs have different eligibility requirements, "DIB and SSI are available only

for those who have a 'disability.'"   *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

"Disability" means:

> inability to engage in any substantial gainful activity by reason of
> any medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.     Analysis and Conclusions

### 1.  The ALJ's Decision Is Supported By Substantial Evidence

In social security cases, the Commissioner determines whether a claimant is disabled within the meaning of the Social Security Act and, thereby, entitled to benefits. 42 U.S.C. § 405(h).  Judicial review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  The substantial-evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  "The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).  Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion."  *Callahan*, 109 F.3d at 273.

The ALJ's written decision in this matter reveals that he properly applied the five step analysis and supported his findings at each step with "relevant evidence [that] a reasonable mind might accept as adequate to support" his conclusions.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  The ALJ recognized that Plaintiff's ADHD, OCD, and borderline intellectual functioning were severe impairments that significantly limited Plaintiff's ability to perform basic mental work activities (Tr. 13).  The ALJ then properly accounted for all of Plaintiff's established mental functional limitations when assessing Plaintiff's residual functional capacity (RFC).  Specifically, the ALJ found that Plaintiff could only perform jobs that involved simple, routine, and repetitive tasks; that required little judgment

and no production rate; that could be learned in a short period of time; that involved no interaction with the public and only occasional interaction with co-workers; and that allowed for close supervision every hour to check to see if she was on task (Tr. 4).

The evidence in the record supports the ALJ's findings  Plaintiff's long-time treating pediatrician, Dr. Dave, reported that Plaintiff had no functional limitations and needed no accommodations; she was trainable and could function in society; and she could work full-time if supervised (Tr. 299).  James and Kathleen LaCombe reported that Plaintiff would be good at tasks requiring repetitive behavior and having predictable outcomes in a sheltered setting, even though her employment opportunities would be limited (Tr. 302).  Mr. Kolito opined that Plaintiff would likely succeed in a non-competitive, non-technical community college program and would be a good candidate for a childcare program (Tr. 306). And, the state agency mental health expert who reviewed the evidence, Dr. Tsai, opined that Plaintiff could perform unskilled work notwithstanding her mental conditions (Tr. 280-98).

The only solid evidence in the record of Plaintiff's inability to work is the Goodwill Industries report which, Plaintiff claims, concludes that she is not employable because her supervisor/evaluator identified several areas of concern relating to her employability and recommended that she reapply for SSI (Dkt. 10; Pl.'s Br. at 4; Tr. 149-54).  While it is true that the Goodwill report reveals that Plaintiff exhibited some problematic work behaviors over the 4-week test period, the ALJ reasonably credited those findings when he crafted Plaintiff's RFC assessment (Tr. 17, 19-20).  Indeed, the ALJ found that Plaintiff would need close supervision every hour to check to see if she is on task, in addition to several other mental work related restrictions (Tr. 4).  This conclusion is consistent with the level of impairment suggested by the Goodwill report.

Last, the ALJ properly relied on the testimony of a Vocational Expert in determining that there were jobs in the regional and national economy that Plaintiff could perform (Tr. 21). *See, e.g., Parley v. Sec'y of Health & Human Servs*., 820 F.2d 777, 779 (6th Cir. 1987) ("Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question ... if the question accurately portrays [the] plaintiff's individual physical and mental impairments.") (internal citations omitted); *see also Webb v. Comm'r of Soc. Sec*., 368 F.3d 629, 632 (6th Cir.2004). In sum, the ALJ's RFC with regard to Plaintiff was accurate and supported by substantial evidence. Therefore, the ALJ could reasonable rely on the VE's response to his hypothetical question. Accordingly, the ALJ's ultimate finding of "not disabled" is supported by substantial evidence and should not be disturbed by this Court.

### 2. The Letters Attached To Plaintiff's Brief Do Not Warrant A Sentence Six Remand

Plaintiff additionally argues that the Court should remand this matter for consideration of two letters from Plaintiff's treating physicians that were not submitted to the ALJ (Dkt. 10; Exs. 1 and 2). The procedural vehicle to request a remand to consider evidence not submitted to the ALJ is "sentence six" of 42 U.S.C. § 405(g). A sentence six remand is appropriate upon a showing that: (1) there is new evidence that is material; and (2) there is good cause for not having presented this evidence at the earlier administrative proceeding. *See Bass v. McMahone*, 499 F.3d 506, 513 (6th Cir. 2007).

To establish that the letters are "material," Plaintiff must demonstrate that there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence. *See Sizemore v. Sec'y of Health & Human Servs*., 865 F.2d 709, 711 (6th Cir. 1988). Plaintiff cannot do so. First, the ALJ "is not required to accept a treating physician's conclusory opinion on the ultimate issue of disability." *Maple v.*

-19-

*Comm'r of Soc. Sec.*, 14 Fed. App'x. 525, 536 (6th Cir. 2001); *see also* 20 C.F.R. § 404.1527(e). The two letters attached to Plaintiff's motion for summary judgment are conclusory opinions, and the ALJ would not be bound by these opinions. Second, the highly restrictive opinions expressed in Drs. Dave and Sawka's letters are at odds with their contemporaneous treatment notes. Dr. Dave's September 2011 letter stating that Plaintiff could not work – which, incidentally, he proffered when Plaintiff was no longer his patient – directly contradicts his August 2007 opinion that Plaintiff had no functional limitations and needed no accommodations; she was trainable and could function in society; and she could work full-time if supervised (Tr. 55, 299). Similarly, Dr. Sawka's opinion that Plaintiff was functioning at an IQ level of 66 conflicted with the most recent results of intelligence testing showing that Plaintiff attained a verbal IQ score of 74, a performance IQ score of 83, and a full scale IQ score of 76 (Tr. 305-06). As such, the two letters do not create a reasonable probability that the ALJ would reach a different conclusion if this matter were remanded. Thus, Plaintiff has not established that the letters are "material" for purposes of a sentence six remand.

Furthermore, this matter should not be remanded for consideration of the two physicians' letters under sentence six because there is no "good cause" to do so. "In order to show good cause the complainant must give a valid reason for [her] failure to obtain evidence prior to the hearing." *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986) (citing *Willis v. Sec'y of Health and Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984)). "Good cause" is not established solely because the new evidence was not generated until after the ALJ's decision; the Sixth Circuit has taken a "harder line" on the good cause test. *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986); *see also Perkins v. Apfel*, 14 Fed. App'x. 593,

598–99 (6th Cir. 2001). Because Plaintiff has offered no explanation to support why these letters were not submitted to the ALJ, no good cause can be found for a sentence six remand.

## III.     RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated: April 30, 2012

<u>Certificate of Service</u>

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, April 30, 2012, by electronic and/or ordinary mail.*

<u>s/Melody Miles</u>
*Case Manager Magistrate Judge Mark A. Randon*
*(313) 234-5542*